UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEANLIM YITH AND SEAK LEANG YITH, | No. 1:14-cv-01875-NONE-SKO |
| Plaintiffs, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| ALEJANDRO MAYORKAS, et al., | |
| Defendants. | |

The matter before the court concerns the naturalization applications of sibling-plaintiffs, Seanlim Yith and Seak Leang Yith. (Doc. No. 69.) Plaintiffs sought hearings[1] on their naturalization applications pursuant to 8 U.S.C. § 1447(b), after defendants[2] failed to make timely determinations with respect to those applications under 8 U.S.C. § 1446. (*Id*. at ¶ 1.) For the

---

[1] The word "hearing" is the term used in 8 U.S.C. § 1447(b).

[2] "Defendants" in this case are, collectively, Alejandro Mayorkas, Secretary for Department of Homeland Security; Ur Mendoza Jaddou, Director for U.S. Citizenship and Immigration Services; Monica E. Toro, Acting District Director, U.S. Citizenship and Immigration Services; Lynn Q. Feldman, Director of the Fresno Office of U.S. Citizenship and Immigration Services; and Merrick Garland, Attorney General of the United States, all named in their official capacity. Most defendants have been substituted automatically in this action. Fed. R. Civ. P. 25(d). With the 2021 change in Presidential administrations, other appointments remain in flux and thus, substituted defendants do as well.

reasons that follow, the court finds that plaintiffs have not met their burden of proof and therefore will deny plaintiffs' naturalization applications.

**PROCEDURAL BACKGROUND**

This action was initiated by plaintiffs with the filing of their original complaint on November 25, 2014.[3] (Doc. No. 1.) At the time, plaintiffs' naturalization interviews[4] had been cancelled by U.S. Citizenship and Immigration Services ("USCIS") without being rescheduled, and plaintiffs' naturalization applications had not been adjudicated. (*Id.*) In the filing of this action plaintiffs sought adjudication as relief. (*Id.*) After interviews were conducted during the pendency of this litigation, plaintiffs were sent notices of an intent to deny their applications on the ground that their father's marriage to a U.S. citizen was not valid for immigration purposes. (Doc. Nos. 31 at 2; 36 at 3; 36-1 at Ex. 1.) On July 7, 2015, notices to appear for removal proceedings were issued for plaintiffs. (Doc. No. 31 at 2.) On September 9, 2015, defendants filed a motion to dismiss this action, arguing that the initiation of removal proceedings divested the district court of subject matter jurisdiction or that, alternatively, plaintiffs' complaint failed to state a claim upon which relief could be granted. (Doc. No. 36.) The district court granted the motion, dismissing plaintiffs' complaint due to their failure to state a claim. (Doc. No. 50.) Plaintiffs appealed from that dismissal order. (Doc. Nos. 58, 59, 60.)

On appeal, the Ninth Circuit reversed the district court, finding that 8 U.S.C. § 1429, which imposes a limitation on "the executive branch's adjudication of naturalization applications," "does not preclude a district court from considering a naturalization application that is properly before the court pursuant to § 1447(b)." *Yith v. Nielsen*, 881 F.3d 1155, 1158, 1161 (9th Cir. 2018). After the Ninth Circuit's reversal, plaintiffs filed their first amended complaint in this action which is the operative complaint. (Doc. No. 69.) Defendants then filed a motion to remand the matter to USCIS pursuant to § 1447(b) (indicating that the district court "has

---

[3] The district court judge initially assigned to this matter presided over the litigation from its inception in 2014 until February 2020, when that judge assumed senior status. The case was then reassigned to the undersigned.

[4] An applicant interview is included in the "examination" referenced in § 1447(b).

2

jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter"). (Doc. No. 78.) Defendants motion to remand was denied. (Doc. No. 88.)

This case was thereafter set for a bench trial (*see* Doc. No. 93), and the then-presiding district judge entertained and resolved motions *in limine* (*see* Doc. No. 122). The original January 7, 2020 trial date was vacated due to a conflict with a criminal trial with statutory priority over this civil matter. (*See* Doc. No. 128.) Soon thereafter, the district judge previously presiding over this action took inactive senior status. Throughout the remainder of 2020 and early 2021, the COVID-19 pandemic significantly impacted court operations, precluding the in-person bench trial requested by plaintiffs. The undersigned finally conducted a three-day bench trial hearing on this matter from June 15, 2021, through June 17, 2021.[5]

Pursuant to Federal Rule of Civil Procedure 52, the court now finds the following facts and separately states its conclusions of law. Fed. R. Civ. P. 52(a)(1).

## LEGAL FRAMEWORK

To be eligible for naturalization, an applicant must establish that:

(1) he or she is at least 18 years of age;

(2) he or she has been lawfully admitted as a permanent resident of the United States;

(3) he or she has resided continuously within the United States for a period of at least five years after having been lawfully admitted for permanent residence;

(4) he or she has been physically present in the United States for at least 30 months of the five years preceding the date of filing of the naturalization application;

(5) he or she has resided for at least three months in the state or district where the applicant filed the application;

(6) he or she has resided continuously within the United States from the date of the naturalization application up to the time of admission

---

[5] During those three days, litigants' time in the courtroom was limited to approximately 4-5 hours each day as part of COVID-19-related safety protocols. (Doc. Nos. 140, 151.) Opening statements, testimony, and closing arguments were completed within the three-day time frame.

> to citizenship; and
>
> (7) for all relevant time periods, he or she has been and continues to be a person of good moral character, attached to the principles of the Constitution, and favorably disposed toward the good order and happiness of the United States.

8 U.S.C. § 1427; 8 C.F.R. § 316.2.

A naturalization applicant has not been "lawfully admitted for permanent residence" where the applicant "obtained [his or her] permanent resident status by fraud, or had otherwise not been entitled to it." *In re Koloamatangi*, 23 I & N Dec. 548, 550 (BIA 2003) (cited with approval in *Monet v. I.N.S.*, 791 F.2d 752, 753 (9th Cir. 1986)). "Although the facts of both *Monet* and *Koloamatangi* involve acts of personal fraud or misrepresentation, their holdings broadly deem all grants of LPR status that were not in substantive compliance with the immigration laws to be void *ab initio*." *Kyong Ho Shin v. Holder*, 607 F.3d 1213, 1217 (9th Cir. 2010).

Whether a marriage is a "qualifying marriage" for immigration purposes, i.e. entered into "in good faith," is "an intrinsically fact-specific question . . . ." *Damon v. Ashcroft*, 360 F.3d 1084, 1088 (9th Cir. 2004). In the context of a couple still married but no longer cohabitating, the Ninth Circuit has stated that "[e]vidence of [a] marriage's *bona fides* may include":

> jointly-filed tax returns; shared bank accounts or credit cards; insurance policies covering both spouses; property leases or mortgages in both names; documents reflecting joint ownership of a car or other property; medical records showing the other spouse as the person to contact; telephone bills showing frequent communication between the spouses; and testimony or other evidence regarding the couple's courtship, wedding ceremony, honeymoon, correspondences, and shared experiences.

*Agyeman v. I.N.S.*, 296 F.3d 871, 882–83 (9th Cir. 2002) (citing *Matter of Soriano,* 19 I & N Dec. 764, 766 (BIA 1988); 8 C.F.R. § 216.4(a)(5)).

In the context of a couple no longer married or in touch with one another, making the filing of a joint petition impossible, the Ninth Circuit has stated "[e]vidence relevant to [the couple's] intent includes, but is not limited to, . . . insurance policies, property leases, income tax

forms or bank accounts, and testimony or other evidence regarding their courtship, wedding ceremony and whether they shared a residence." *Damon*, 360 F.3d at 1088 (alteration added) (citing *Matter of Laureano,* 19 I. & N. Dec. 1, *3 (BIA 1983) and 8 C.F.R. § 216.5(e)(2)(i)-(iv)).

## FINDINGS OF FACT

**A.     The Limited Scope of the Hearing**

Prior to the court hearing, the parties to this action generally agreed—and the court was aware based on motions *in limine*, trial briefing, and an agreed statement of facts—that the litigation of plaintiffs' naturalization applications was likely to turn on whether plaintiffs could establish their lawful admission as permanent residents of the United States. (Agreed Stmt. of Facts, Doc. No. 126 at ¶ 6; *see also* Doc. Nos. 120, 121, 122, 144, 148.)[6] Resolution of this question, in turn, centered on whether the marriage of plaintiffs' father to a U.S. citizen was valid for immigration purposes. (*Id*.)

Early in the testimony of the first witness, as questions pertinent to other naturalization criteria were asked, defendants objected based on relevancy. (Trial Tr., Vol. 1, 32:12–16.)[7] Defendants stated their position that the only issue to be heard by this court was whether plaintiffs had been lawfully admitted as permanent residents of the United States. (Vol. 1, 32:12–16.) When the court questioned the firmness of defendants' position, defendants affirmed their stance while also reserving the right to address other issues that might arise during the course of the hearing, such as the offering of perjurious testimony. (Vol. 1, 32:19–33:13.) By the conclusion of the hearing, defendants had not raised any additional issues. Therefore, the only question

---

[6] As explained in the motion *in limine* ruling, plaintiffs have at various stages of this case raised objections on due process grounds to their being required to disprove the fraudulent intent of an individual (i.e., their father) who is not a party to this case. (Doc. No. 122 at 8.) The court's order addressing the motions *in limine* resolved any generic objection of this nature, but left open the possibility that due process considerations might impact specific evidentiary rulings at trial. (*Id*. at 8–9.) Although plaintiffs did reiterate their due process concerns and suggested those concerns should go to the weight of the evidence, they made no further, specific evidentiary objections on due process grounds at trial.

[7] There are three volumes of the reporter's transcript of the trial proceedings in this case that correspond with the three days of trial: Vol. 1 (Doc. No. 158); Vol. 2 (Doc. No. 159); and Vol. 3 (Doc. No. 160). Citations to the trial transcript herein will use the volume number rather than the docket number.

before the court is the question of plaintiffs' lawful admission.

**B.     Plaintiffs Seanlim and Seak Leang**

Seanlim[8] and Seak Leang Yith, sister and brother, immigrated to the United States from Cambodia when they were minors, entering the country on March 27, 2006. (Vol. 1, 21:2, 54:14–19, 55:1–16, 102:15–25, 118:22–119:16.) At the time of their entry, the siblings were approximately fourteen and eleven years old, respectively.[9]  (Vol. 1, 54:14-15, 118:22–23.) Plaintiffs' entry into the country was based on their father's marriage to a United States citizen, Sarin Meas. (Vol. 1, 29:24–30:9, 31:13–16, 104:10–17; D-A; D-H.) Shortly after immigrating, on April 3, 2006, plaintiffs' received Lawful Permanent Resident ("LPR") status. (P-1, P-2.) Seanlim and Seak Leang filed N-400 applications for naturalization dated January 30, 2011, and November 24, 2012, respectively. (JX-3; JX-4.)

Since arriving in the United States approximately fifteen years prior to the time of the hearing, Seanlim Yith graduated from high school, went on to college, and became an accountant. (Vol. 1, 34:10–35:23.) She is also a small business owner and spends long hours working her two jobs, in addition to the time she spends volunteering. (Vol. 1, 34:10–35:23.) Her accomplishments are certainly admirable. Seanlim filed for citizenship because of the attendant rights citizenship affords, such as voting in presidential elections. (Vol. 1, 34:10–35:23.) But this matter, as well as her long hours working, are sources of stress for Seanlim. (Vol. 1, 34:10–35:23.)

Seanlim appeared to the undersigned to be uncomfortable and reluctant when discussing her father's relationship with Sarin Mean, the U.S. citizen to whom he purportedly was married. (Vol. 1, 58:19–59:21, 60:11–15, 63:6–22, 64:10–68:6, 69:20–71:7.) Seanlim herself has never met, seen, or corresponded with Meas and cannot state with certainty how long her father lived

---

[8]  Seanlim testified at trial that "Sean" is her first name and "Lim" is her middle name, but the two became combined during the immigration process. (Vol. 1, 77:21–23.) The court recognizes that "Sean Lim" is the correct spelling of plaintiff's name but will continue to use "Seanlim" for consistency.

[9]  Seanlim and Seak Leang's respective dates of birth are December 18, 1991, and October 29, 1994. (Vol. 1, 54:14-15, 118:22–23.)

6

with Meas; however, when she was still in Cambodia, Seanlim's father did tell her that he was marrying Meas. (Vol. 1, 59:7–17, 60:11–15, 62:25–63:17.) Seanlim knew very little about the relationship beyond that bare fact and did not discuss the matter further with her father. (Vol. 1, 64:10–68:6, 69:20–71:7.)

Like his sister, Seak Leang also attended and graduated high school and college after arriving in the United States. (Vol. 1, 101:6–19, 108:4–12.) He currently works as a research scientist while attending graduate school full-time. (Vol. 1, 101:6–23.) As is the case with his sister, Seak Leang's accomplishments since coming to this country are praise worthy. Seak Leang filed his naturalization application because he has lived much of his life in the United States and considers it to be his home. (Vol. 1, 106:19–23.) He feels attached to the ideals behind the formation of this country. (Vol. 1, 106:25–107:10.)

Seak Leang also has never met, seen, spoken with, or lived in the same household as Sarin Meas. (Vol. 1, 123:24–124:2, 124:22–125:3, 134:2–10.) He was aware when his father married Meas, but Seak Leang discussed the matter with his father very little. (Vol. 1, 124:3–15.) He also does not know whether his father ever lived with Meas. (Vol. 1, 124:20–22.)

**C.     Plaintiffs' Father and Sarin Meas[10]**

Neth Yith, the plaintiffs' father, came to the United States on a visitor visa knowing he would be required to leave this country unless his immigration status changed. (Vol. 2, 187:2–14.) Neth married Sarin Meas on August 1, 2003, in a ceremony conducted at a county courthouse in Fresno. (JX-5; Vol. 2, 192:1–3; D-ZZ, 169:6–16.) Distant relatives of Neth's may have attended the ceremony, as well as Meas' parents. (Vol. 2, 209:19–210:4; D-YY, 63:16–64:3.) Neth and Meas (in her deposition testimony) contradicted one another regarding whether there was a meal held in honor of the marriage after the ceremony. (Vol. 2, 210:5–211:16; D-YY, 70:19–71:6, 114:3–10; D-ZZ, 154:13–25.)

---

[10] The court determined that Meas was an unavailable witness under Federal Rule of Civil Procedure 32(a) and Federal Rule of Evidence 804 and, accordingly, allowed her deposition testimony to be entered into evidence. (Vol. 2, 157:22–160:12; D-YY; D-ZZ.) Objections during Meas' deposition occurred with some regularity. The court considered those objections as it has reviewed the deposition.

The marriage between Neth and Meas was arranged through Meas' father and the owner of the business at which Meas' father was formerly employed.  (D-YY, 35:20–37:15; D-ZZ, 133:9–19.)  Neth was aware after meeting Meas' family that if he and Meas were to marry, he would be able to stay in the United States.  (Vol. 2, 187:2–14.)  Meas' parents acted in Meas' place in speaking with Neth about the marriage.  (Vol. 2, 188:6–16, 189:1–5; D-ZZ, 135:7–9.)  As a result, Neth and Meas did not discuss, pre-maritally, issues such as having children or handling family finances.  (Vol. 2, 190:5–19; D-YY, 53:6–54:5.)  Indeed, they spoke very little prior to marrying, though they may have gone to a park once or twice and out to eat (but always with Meas' parents present).  (D-YY, 39:25–40:11, 45:16–46:4.)  Upon marriage, Neth paid Meas' family six thousand dollars, which Neth and Meas characterize as a dowry that was in line with Cambodian traditions.  (Vol. 2, 191:5–22; D-YY, 92:10–24.)  Neth and Meas also both described arranged marriages as common within Cambodian culture.  (Vol. 2, 204:12–22, 206:4–25; D-YY, 54:21–55:12, 102:2–16; D-ZZ, 140:23–141:4.)  Meas considered her marriage to Neth to have been arranged by her parents.  (D-YY, 103:1–9.)

Neth and Meas also contradicted one another regarding whether they lived together for a week following their marriage or whether Neth merely visited Meas and her family during this time period.  (Vol. 2, 172:6–23; D-YY, 64:7–65:3, 67:19–68:7, 69:9–16; D-ZZ, 154:4–9, 197:15–198:1, 199:19–23.)  Regardless, there were never any marital relations between Neth and Meas.  (Vol. 2, 192:25–193:5; D-YY, 69:20–70:18; D-ZZ, 159:21–160:4.)  At the time of their marriage, Neth and Meas had difficulty communicating because Meas could understand but not speak Neth's primary language (Khmer) and Neth spoke little English.  (Vol. 2, 205:19–206:3; D-YY, 38:23–39:6; D-ZZ, 129:2–132:16.)

When Neth returned to Fresno (where he had been living prior to the marriage), Meas did not accompany him nor did she follow him there at a later time.  (Vol. 2, 172:15–23; D-ZZ, 153:10–13.)  Neth, however, stayed in contact with Meas' parents, particularly her father, meeting with him several times, and coming to the family home in an attempt to work out the marital issues and to persuade Meas to move to Fresno.  (Vol. 2, 172:24–173:1, 208:8–209:18; D-ZZ, 151:25–152:16, 155:23–156:5, 208:3–23.)  Meas herself was not a part of these discussions,

1    though Meas knew that Neth wanted her to live with him in Fresno.  (Vol. 2, 172:24–173:4,
2    209:16–18; D-YY, 66:11–67:8, 67:19–24; D-ZZ, 151:25–152:10.)

3            Meas' feelings about her marriage to Neth, and her interpretation of events surrounding
4    her marriage, have changed over time.  (D-YY, 42:17–43:11; D-ZZ, 147:2–9.)  Meas had no
5    personal desire to marry Neth, but she wanted to make her parents and Neth happy and she
6    thought marrying Neth would accomplish that.  (D-YY, 41:7–42:16, 43:12–17, 50:5–20.)  She
7    felt pressured by her parents to marry Neth.  (D-YY, 91:25–92:6 .)  Meas did not have any
8    romantic or tender feelings for Neth, and after the wedding, she attempted to make herself feel
9    more for him but was not successful in that regard.  (D-YY, 37:17–24, 43:16–44:23, 62:12–15,
10   74:8–19.)

11           Meas did not believe that Neth married her for immigration purposes at the time of the
12   marriage and for some time thereafter.  (D-YY 90:2–15, 94:4–5, 94:11–13; D-ZZ, 147:2–9,
13   148:3–16.)  However, by the time she was deposed in connection with this litigation, she had
14   come to feel used.  (D-YY, 75:2–10, 94:14–95:11.)  Meas represents that her marriage to Neth
15   was not fraudulent insofar as she chose to marry him.  (D-YY, 96:4–6.)

16           At some point in the processing of Neth's or his childrens' citizenship applications, Neth
17   and Meas were interviewed by USCIS in Santa Ana.  (D-GG; D-YY, 93:12–19.)  Meas later
18   stated that the interviewer told her and Neth that he, the interviewer, did not believe the marriage
19   between Neth and Meas was valid for immigration purposes and if Meas proceeded, she might be
20   subject to criminal penalty.  (D-YY, 93:12–22, 107:22–108:6, 108:12–14, 112:17–18; D-ZZ,
21   180:3–21, 183:17–184:11.)  This was impactful on Meas, and she asked her parents afterwards to
22   tell Neth that she did not want to see him anymore.  (D-ZZ, 186:4–18, 209:2–16.)

23           In 2011, agents from Homeland Security appeared at Meas' house and informed Meas that
24   they had questions about her marriage to Neth, including its validity.  (D-YY, 82:2–9, 84:18–24.)
25   During this meeting, Meas drafted a sworn statement indicating that the marriage had been
26   undertaken for immigration purposes only and was not a true marriage.  (D-GG; D-YY, 85:7–
27   86:4, 88:20–89:9.)  Meas later distanced herself from parts of the statement she wrote at the time
28   of her meeting with the agents.  (D-ZZ, 127:15–19.)  Specifically, Meas explained that she first

came to believe Neth had married her for immigration purposes when the agents told her Neth had done so, which in turn led Meas to draft the statement during her meeting with the agents. (D-YY, 89:10–90:19, 107:14–21; D-ZZ, 147:16–148:2, 180:3–21.) It appears that one of the agents prompted or assisted Meas in writing the first two sentences of her written statement. (D-YY, 90:25–91:9, 95:12–21, 96:16–18; D-ZZ, 184:23–185:8, 190:4–14; Vol. 3, 315:18–316:15, 323:4–12.)

**D.     Immigration Officer Billy Nelms**

Billy Nelms was working for USCIS as an immigration officer when irregularities were discovered among cases with which he was associated. (D-JJ; Vol. 3, 291:1–17, 292:22–293:23.) Eventually, Nelms was charged with and convicted of crimes related to the processing of certain immigration cases. (D-KK.) No evidence was presented that the Yith family was directly linked to Nelms' criminal charges or his subsequent trial on those charges, though Nelms implicated Neth during the government's investigation of Nelms's wrongdoing. (D-EE; D-JJ; Vol. 3, 308:15–19.)

Neth agrees he was in contact with Nelms, speaking with him on at least two to three occasions, one of which was the interview for Neth's immigration application conducted by Nelms. (Vol. 2, 196:25–197:7.) Neth also spoke to Nelms about plaintiffs' immigration applications, and Nelms processed some paperwork related to Neth's application. (Vol. 2, 197:8–18, 198:6–7, 198:19–23, 199:10–20.)

The primary events and evidence from Neth and Nelms' association originated after Neth's marriage to Meas and cover roughly a two-year time-period immediately thereafter. (D-P; D-Q; D-II.) Nelms handling of Neth's application was irregular and apparently inconsistent with Nelms' lawful authority (but a delegation of special authority to Nelms for purposes of approving Neth's applications, while very unlikely, is not entirely impossible). (Vol. 3, 267:15–268:12, 274:19–275:7.) Neth's application for adjustment of status—i.e., his application for permanent residency or, colloquially, a green card—was approved on paper by Nelms, but tellingly no electronic record of that green card's approval can be found by USCIS. (Vol. 2, 230:23–231:12; Vol. 3, 267:15–268:12, 269:1–6.) Electronic records today reflect Neth's immigration status as

that of a B-2 visa holder, not a lawful permanent resident. (Vol. 3, 271:13–16.) Later, in May 2007, Neth's paper A-file, or alien file, was also determined to be completely missing from USCIS records. (Vol. 2, 238:15–239:2; Vol. 3, 269:7–11.) Finally, the evidence establishes that Nelms was the last person to whom Neth's A-file could be clearly traced, in July 2006. (Vol. 3, 269:12–271:4.)

**E.     Kea Chhuon**

Sean Lim and Seak Leang's maternity (and that of their other sibling) was placed at issue in this litigation and was addressed at the court trial of this matter. (Vol. 1, 55:17–57:18, 119:21–120:9.) Both plaintiffs previously asserted that their mother was a woman named Channa Keo. (Vol. 1, 55:17–57:18, 119:21–120:1.) However, plaintiffs later stated that they had learned that their mother was instead a woman named Kea Chhuon, a fact allegedly revealed to them by their attorney after the deposition of Chhuon in this case. (Vol. 1, 55:17–57:18, 120:2–9.) Plaintiffs maintain that the two women are different people and that their father divorced Channa Keo prior to emigrating from Cambodia and later reunited with Kea Chhuon many years after arriving in the United States and dated her for a period of time thereafter. (Vol. 1, 55:17–57:18, 57:25–58:4, 58:14–18, 89:11–13, 120:10–17, 120:23–121:5, 131:10–132:9.) The government questions this account, in part because Kea Chhuon reported living at the same address in Cambodia as the Yiths for some period of time, and Chhuon also had pictures of the Yith siblings appearing in her passport. (D-I; D-Y; Vol. 1, 76:6–16, 121:21–122:16.)

Like his children, Neth Yith maintains that Channa Keo and Kea Chhuon are different women and that Chhuon is the biological mother of his children, while Keo was his wife for approximately four years after his relationship with Chhuon ended. (Vol. 3, 165:16–18, 170:16–25.)

## CONCLUSIONS OF LAW

As mentioned, when petitioning for naturalization, a plaintiff bears the burden of establishing by a preponderance of the evidence that he or she was lawfully admitted as a permanent resident to the United States. 8 C.F.R. § 316.2. Here, plaintiffs have failed to meet that burden.

"[A] narrow reading of the term 'lawfully admitted' distorts its meaning. Admission is not lawful if it is regular only in form. The term 'lawfully' denotes compliance with substantive legal requirements, not mere procedural regularity . . . ." *Monet v. I.N.S.*, 791 F.2d 752, 753 (9th Cir. 1986) (quoting with approval *In re Longstaff,* 716 F.2d 1439, 1441 (5th Cir.1983)). Here, the parties agree that plaintiffs satisfy procedural regularity insofar as they are, and have been, lawful permanent residents of the United States for a number of years. (Agreed Stmt. of Facts, Doc. No. 126 at ¶¶ 12–17; Vol. 1, 32:12–16.) But there is the other half of the equation, and satisfying the substantive legal requirements entails more. Plaintiffs must demonstrate that their route to obtaining lawful permanent residency was also itself carried out in accordance with the law. *Monet*, 791 F.2d at 753; *Koloamatangi*, 23 I & N Dec. at 550.

The marriage of plaintiffs' father to a U.S. citizen made plaintiffs the stepchildren of a U.S. citizen. That relationship formed the basis of their admission to the United States and their adjustment of status to that of lawful permanent residency. (*See* D-A; D-H.) Because their father's marriage was fundamental to plaintiffs' admission to lawful permanent residency status, plaintiffs must demonstrate that the marriage was valid for immigration purposes.

In the immigration context, a marriage must be entered into in "good faith" and "not for the purpose of procuring an immigration benefit." *Damon*, 360 F.3d at 1088. "There is no set formula to be applied in determining whether a marriage was entered into in good faith. 'The concept of establishing a life as marital partners contains no federal dictate about the kind of life that the partners may choose to lead.'" *Id*. at 1089 (quoting *Bark v. INS,* 511 F.2d 1200, 1201 (9th Cir. 1975)). Nonetheless, a "central question" is whether the parties to a marriage "intended to establish a life together at the time they were married." *Id*. at 1088 (citing *Bark,* 511 F.2d at 1201). Evidence demonstrating the *bona fides* of the marriage must be considered, which may include but is not limited to:

> jointly-filed tax returns; shared bank accounts or credit cards; insurance policies covering both spouses; property leases or mortgages in both names; documents reflecting joint ownership of a car or other property; medical records showing the other spouse as the person to contact; telephone bills showing frequent communication between the spouses; and testimony or other

12

> evidence regarding the couple's courtship, wedding ceremony, honeymoon, correspondences, and shared experiences.

*Agyeman*, 296 F.3d at 882–83.

Here, there is no evidence of many of the common indicia of an intent to establish a life together by Neth and Meas. There are no join tax returns, shared bank accounts, insurance policies, leases or mortgages, or telephone calls; there is no jointly owned property or designation of one another as emergency contacts. There *may* have been an extremely modest courtship that consisted of some meals and a visit or two to a park, all chaperoned, but the wedding ceremony of Neth and Meas was perfunctory, and there was no honeymoon, no correspondence, and no other shared experiences. The testimony of Neth and Meas, viewed in totality, indicated that none of the evidence associated with an intent to establish a life together would be forthcoming because theirs was, at most, an arranged marriage. Yet, it also cannot be overlooked that Neth and Meas, virtual strangers before they entered into marriage, remained virtual strangers even thereafter.

Even viewing the marriage through the lens that it possibly was arranged, some of the most fundamental aspects of an intent to establish a life together are absent here. Neth and Meas did not live together, and even though they resided in cities several hours apart by car, they did not correspond. Neth and Meas even contradicted one another as to whether Neth had lived in the Meas' family home for a week following the marriage, with Meas contending Neth only visited her family's home during that time. Moreover, the evidence establishes that Neth and Meas could not even easily or readily communicate with one another due to language differences—not an insurmountable barrier or dispositive evidence as to the lack of a valid marriage, but certainly evidence of note. While Neth returned to Fresno after the marriage ceremony, Meas remained in Long Beach and expressed a marked preference for not leaving her parents' home. Even then, she and Neth did not discuss their living arrangements. Moreover, the plaintiffs—Meas' stepchildren—never once met or spoke to Meas, let alone lived with her, even after their arrival in the United States. Finally, neither Neth nor Meas could state with any certainty how long Neth's rare visits with her after their marriage lasted.

It is the absence of evidence here that tells the most compelling story. Whether the marriage between Neth and Meas was arranged or not, nothing in their behavior—as demonstrated by the evidence adduced at the bench trial—signals a "commingling of lives," before or after the marriage. Sharma *v. Holder*, 633 F.3d 865, 873 (9th Cir. 2011). As a result, plaintiffs have failed to establish the *bona fides* of their father's marriage to Meas. Therefore, plaintiffs cannot establish by a preponderance of the evidence that they were lawfully admitted for permanent residency to the United States.

The court considered, but does not factor heavily, the evidence introduced at the bench trial concerning Billy Nelms. Most of the evidence concerning Nelms and his relationship with Neth postdates Neth's wedding and encompasses roughly a two-year timespan immediately thereafter. As such, that evidence does not shed significant light on Neth's and Meas' intent when they married. If improprieties (or worse) occurred, which the court need not and does not decide, those acts could conceivably have been driven by the collapse or failure of the marriage. That is, a person may enter into a marriage in good faith and then commit bad acts after the marriage fails, just as plausibly as a person might enter into a marriage without the requisite good faith and also later commit further bad acts in connection with their immigration status. The evidence of Nelms' crimes, whatever Neth's relation to Nelms' criminal conduct, simply does not speak directly to the intent of Neth and Meas when they entered into marriage.

The court has viewed in the same vein the evidence concerning Kea Chhuon and Channa Keo. While the evidence was considered, its relevance to the court's decision is limited, in part because of the unresolved question of whether the two are different individuals or the same person. Thus, while that evidence raises a suspicion of deceit it does not establish a deception.

In short, the having considered all of the evidence the court merely concludes that plaintiffs have failed to carry their burden of establishing their lawful admission for permanent residency to the United States.

/////

/////

/////

**CONCLUSION**

For the reasons set forth above, plaintiffs failed to meet their burden in establishing their lawful admission as permanent residents of the United States by a preponderance of the evidence. Therefore, the court denies their applications for naturalization.

IT IS SO ORDERED.

Dated:   **November 23, 2021**                    /s/ Dale A. Drozd
                                                              UNITED STATES DISTRICT JUDGE